**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**GEORGE PORTER, JR.,**

> **Petitioner,**

-vs-                                                                    Case No.  **6:03-cv-1465-Orl-31KRS**

**JAMES CROSBY, JR., et al.,**

> **Respondents.**

_____

# ORDER

On December 5, 1987, George Porter, Jr. ("Petitioner") pled guilty to two counts of first-degree murder and one count each of armed burglary and aggravated assault.  Following the penalty phase, a jury returned a recommendation of death on both counts of murder.  The trial judge, however, imposed the death penalty on only one count: the murder of Evelyn Williams.  Petitioner's direct appeal and requests for collateral relief were denied by the state courts.  He now seeks relief in this Court pursuant to 28 U.S.C. § 2254, claiming that his federal constitutional rights have been violated.

Petitioner asserts nine claims for relief, the most significant being claim three - ineffective assistance of counsel during the penalty phase.

## I.      Background

The facts adduced at trial, as set forth by the Supreme Court of Florida, are as follows:

In 1985 in Melbourne, Florida, Porter became the live-in lover of the first victim, Evelyn Williams ("Williams").  Their relationship was stormy almost from the beginning, aggravated by hostility between Porter and Williams' children, especially Williams' daughter, Amber.  Several violent incidents occurred during the course of Porter's relationship with Williams. In July 1986, Porter damaged Williams' car while

she was at work, and later he telephoned and threatened to kill Williams and Amber. Porter left town shortly thereafter and was not seen again in town until early October 1986.  Before Porter returned to Melbourne, Williams had entered a relationship with the second victim, Walter Burrows.

When Porter returned to town, he contacted Williams' mother, Lora Mae Meyer.  He told her that he wanted to see Williams, and that he had a gift for her.  Meyer told Porter that her daughter did not wish to see him anymore, and that Williams wanted nothing from him.  Nevertheless, Porter persisted.  During each of the two days immediately preceding the murder, Porter was seen driving past Williams' house.

A few days before the murder, Porter had a conversation with a friend, Nancy Sherwood, who testified that Porter told her, "you'll read it in the paper."  She offered no explanation for Porter's remark.  Porter went to the home of another friend, Dennis Gardner, and asked to borrow a gun.  Gardner declined, but the gun subsequently vanished from Gardner's home.

On October 8, 1986, Porter visited Williams, who then called the police because she was afraid of him.  That evening, Porter went to two cocktail lounges.  He spent the night with a friend, Lawrence Jury, who said that Porter was quite drunk by 11 p.m.

At 5:30 a.m. the next morning, Amber awoke to the sound of gunshots.  She ran down the hallway and saw Porter standing over her mother's body. Amber testified that Porter came toward her, pointed a gun at her head and said, "boom, boom, you're going to die."  Burrows then came into the room, struggled with Porter, and forced him outside.  Amber telephoned for emergency assistance.

Williams' son, John, who lived next door, testified that he heard gunshot blasts at about 5:30 a.m.  He ran outside and saw Burrows lying facedown in the front lawn. Both Williams and Burrows were dead by the time police arrived at the scene.

*Porter v. State*, 564 So. 2d 1060, 1061-62 (Fla. 1990).

## II.    Prior Proceedings

Petitioner was indicted in October of 1986 for the murders of Evelyn Williams and Walter

Burrows.  He was also charged with burglary and aggravated assault.  After the appointment of various

attorneys to represent him, Petitioner requested permission to represent himself.  The state trial court

appointed Drs. J. Lloyd Wilder and Constance Kay to examine Petitioner to determine his competency

to proceed. Both doctors found Petitioner to be competent, and the state trial court granted his request to represent himself at trial. The state trial court, however, appointed attorney Sam Bardwell to serve as stand-by counsel. The guilt phase of Petitioner's trial commenced on November 30, 1987. On December 5, 1987, after a jury had been selected and had heard several days of the State's evidence, Petitioner entered pleas of guilty to all the charges. That evening, after returning to the Brevard County jail, Petitioner attempted suicide by twice jumping from the second-story railing.[1] At the State's request, Drs. Kay and Wilder conducted psychiatric examinations of Petitioner on December 11 and 13, 1987. Both doctors found him competent. On December 18, 1987, Petitioner withdrew his previous request to represent himself. Mr. Bardwell was then appointed to represent Petitioner.

On January 4, 1988, Petitioner moved to withdraw his guilty pleas, alleging that he had been coerced by threats made against his minor son. The state trial judge made detailed findings and denied the motion to withdraw the guilty pleas.

The penalty phase commenced on January 22, 1988. By a vote of 12-0, the jury recommended the death penalty for the murder of Evelyn Williams. In addition, by a vote of 10-2, the jury recommended the death penalty for the murder of Walter Burrows. On March 4, 1988, following the jury's recommendation, the state trial judge sentenced Petitioner to death for the murder of Evelyn Williams.[2] Petitioner was sentenced to life in prison for the murder of Walter Burrows and for the

---

[1]Petitioner suffered only a broken leg from his falls.

[2]The state trial judge found four aggravating circumstances: previous conviction of another felony involving violence based upon the contemporaneous convictions; that the murder was committed during the commission of a burglary; that the murder was especially heinous, atrocious, or cruel; and that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The judge found no statutory mitigating circumstances

(continued...)

burglary count, as well as a five-year term of imprisonment for the aggravated assault count.  All sentences were ordered to run concurrent.

On direct appeal, the Florida Supreme Court affirmed Petitioner's convictions, but struck the especially heinous, atrocious, and cruel aggravator.  The Florida Supreme Court , however, affirmed Petitioner's death sentence.  *Porter v. State*, 564 So. 2d 1060 (Fla. 1990).  The United States Supreme Court denied certiorari in February of 1991.  *Porter v. Florida*, 498 U.S. 1110 (1991).

Petitioner filed his original Florida Rule of Criminal Procedure 3.850 motion for postconviction relief with the state trial court in June of 1992.  In February of 1995, he filed an amended Rule 3.850 motion.  After conducting a non-evidentiary hearing, the state trial court ordered an evidentiary hearing regarding two ineffective assistance of counsel claims and denied all the remaining claims.  The evidentiary hearing was held on January 4 and 5, 1996, after which the trial court entered a detailed order denying the remaining ineffective assistance of counsel claims.  On May 3, 2001, the Florida Supreme Court affirmed the trial court's denial of Petitioner's 3.850 motion.  *Porter v. State*, 788 So. 2d 917, 928 (Fla. 2001).

Petitioner subsequently filed a petition for writ of habeas corpus which was denied by the Florida Supreme Court on January 9, 2003.  *See Porter v. Crosby,* 840 So. 2d 981 (2003).  Petitioner then filed the instant petition for writ of habeas corpus in this Court.

**III.    Governing Legal Principles**

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Penry*

---

[2](...continued)
and no nonstatutory mitigating circumstance.  (App. A-16 at 2776-84.)

*v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

## A.     Exhaustion and Procedural Default

One procedural requirement set forth in the AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless the petitioner has exhausted all means of available relief under state law.  28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-22 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  Specifically, the AEDPA provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> (A)     the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)     (I)     there is an absence of available State corrective process; or
>
>          (ii)    circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

Thus, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law.  *Coleman v. Thompson*, 501 U.S.

722, 750 (1991).  In addition, a federal habeas court is precluded from considering claims that are not exhausted but would clearly be barred if returned to state court.  *Id*. at 735 n.1 (stating that if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims).

In order to satisfy the exhaustion requirement, a state petitioner must "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard*, 404 U.S. at 275-76) (internal quotation marks omitted).  The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim. *Snowden v. Singletary*, 135 F.3d 732 (11th Cir.), *cert. denied*, 525 U.S. 963 (1998). The United States Supreme Court has observed that "Congress surely meant that exhaustion be serious and meaningful." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992).  Furthermore, the Court explained:

> [c]omity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court.  Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claims on the merits.

*Id*.; *see also Henderson*, 353 F.3d at 898 n.25 ("Both the legal theory and the facts on which the federal claim rests must be substantially the same for it to be the substantial equivalent of the properly exhausted claim.").

Procedural default will be excused only in two narrow circumstances. First, a petitioner may obtain federal review of a procedurally defaulted claim if he can show both "cause" for the default and

actual "prejudice" resulting from the default.  "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999).  To establish "prejudice," a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different.  *Henderson*, 353 F.3d at 892 (citations omitted).

The second exception, known as the "fundamental miscarriage of justice," only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  Actual innocence means factual innocence, not legal insufficiency.  *Bousley v. United States*, 523 U.S. 614, 623 (1998).  To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  In addition, "'[t]o be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324).

### B.      Standard of Review Under the AEDPA

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005), *cert. denied*, 127 S. Ct. 348 (2006).  The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts.  Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id.*

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.  *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

### C.    Standard for Ineffective Assistance of Counsel

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[3] *Id.* at 687-88.  A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Id.* at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir.), *cert. denied*, 493 U.S. 945 (1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted), *cert. denied*, 514 U.S. 1131 (1995).  Under those rules and presumptions, "the cases in which habeas petitioners can properly

---

[3]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

It is well established that the right to effective counsel extends to a defendant's direct appeal. *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir.), *cert. denied*, 469 U.S. 956 (1984). The Eleventh Circuit Court of Appeals has applied the United States Supreme Court's test for ineffective assistance at trial to guide its analysis of ineffective assistance of appellate counsel claims. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991), *cert. denied*, 502 U.S. 1077 (1992); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987). Thus, in order to establish ineffective assistance of appellate counsel, Petitioner must show (1) that counsel's performance was deficient and "fell below an objective standard of reasonableness" and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88.

## IV. The Claims[4]

### A. Claim One - Involuntary Pleas

Petitioner asserts that the state trial court erred by not allowing him to withdraw his pleas of guilty. According to Petitioner, his pleas were not voluntary because they were induced by coercion, terror, and threats against his ten-year-old son.

Petitioner raised this claim on direct appeal. The Florida Supreme Court denied relief, reasoning:

> "[A] plea of guilty must be voluntarily made by one competent to know the consequences of that plea and must not be induced by promises, threats or coercion." *Mikenas v. State*, 460 So. 2d 359, 361 (Fla. 1984); *see also Lopez v. State*, 536 So. 2d 226, 228 (Fla. 1988). To assure that the defendant entered the plea voluntarily, the

---

[4]The ineffective assistance of penalty-phase counsel claim, claim three, will be discussed last.

trial court must make a detailed inquiry on the record. *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L.Ed.2d 274 (1969); *Lopez; Mikenas*. The colloquy in this record reflects that the trial court made a conscientious and detailed inquiry. Indeed, the trial judge took great pains to assure that Porter's guilty pleas were the result of his own free will.

Likewise, we find no error in the trial judge's denial of Porter's motion to withdraw his pleas. In *Lopez*, the Court said:

> Allowing the withdrawal of a guilty plea is within a trial court's discretion; it is not a matter of right. *Adams v. State*, 83 So. 2d 273 (Fla. 1955); *Adler v. State*, 382 So. 2d 1298 (Fla. 3d DCA 1980). The burden of proving a trial court abused its discretion in refusing to allow withdrawal of a guilty plea is on the defendant. *Mikenas; Adams*. After imposition of sentence, that burden means that a defendant must show manifest injustice. *Adler*.

*Lopez*, 536 So. 2d at 229. Although Porter asserts that he was coerced, he refused to give the names of the officers who allegedly made the threat, and he provided no other evidence to prove his claim. Under these circumstances, we do not find that the trial court erred in rejecting his claim as unfounded.

*Porter*, 564 So. 2d at 1063.

A federal court may not set aside a guilty plea entered in a state court, "'[i]f a defendant understands the charges against him, understands the consequences of a guilty plea, and voluntarily chooses to plead guilty, without being coerced to do so. . . .'" *Stano v. Dugger*, 921 F.2d 1125, 1141 (11th Cir. 1991) (quoting *Frank v. Blackburn*, 646 F.2d 873, 882 (5th Cir. 1980)). "Because a guilty plea is equivalent to a conviction, the trial court's determination of voluntariness must consider that '[i]gnorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality.'" *Stano*, 921 F.2d at 1141 (quoting *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969)).

In the instant case, the record indicates that when Petitioner entered his pleas, the state trial court conducted a full inquiry into whether the pleas were knowing and voluntary. *See* App. A-8 at

1488-1523.  The trial court asked Petitioner two times whether he was threatened, pressured, forced, or intimidated into entering his pleas.  *Id.* at 1499 & 1521.  Both times Petitioner responded negatively.  *Id.*  The trial court further asked Petitioner why he wanted to change his pleas, to which Petitioner responded, "Because I want to get it over with."  *Id.* at 1521.

When Petitioner filed the motion to withdraw his guilty pleas, the trial court conducted a hearing.  (App. A-10 at 1654-1774.)  For the first time, Petitioner indicated that he entered the pleas because someone threatened to harm his son if he did not plead guilty.  *Id.* at 1656-57.  Despite the trial court ordering him to do so, Petitioner refused to identify the prison guard/officer or the inmates who allegedly told him about the threat to his son.  *Id.* at 1661-63, 1676-77.  Based on Petitioner's refusal to identify the individuals who allegedly informed him of the threat, the state court determined that there was no threat.  *Id.* at 1772-73.  Thus, the state court concluded that no evidence existed to establish that Petitioner's pleas were involuntary or resulted from threats or coercion.

Petitioner has not demonstrated that the state court's determination is contrary to or an unreasonable application of clearly established federal law.  Petitioner had adequate opportunity to inform the state court of any threats during the plea colloquy, but failed to do so.  Furthermore, Petitioner failed to present any evidence at the hearing on the motion to withdraw his pleas to corroborate his claim that he was threatened or coerced into pleading guilty.  Accordingly, this claim is denied.

### B.    Claim Two - Cold, Calculated, and Premeditated Aggravator

Petitioner contends that his death sentence violates the Eighth and Fourteenth Amendments because the cold, calculated, and premeditated ("CCP") aggravating circumstance was not supported by the evidence.  According to Petitioner, because the evidence did not support this finding, his death

sentence is standardless, arbitrary, and capricious.  Petitioner raised this claim on direct appeal, and

the Florida Supreme Court expressly determined that the State "did meet its burden in proving beyond

a reasonable doubt that the murder was committed in a cold, calculated, and premeditated manner

without any moral or legal justification."  *Porter*, 564 So. 2d at 1063.

With regard to the murder of Ms. Williams, the state trial judge stated that "[t]here is no doubt

that the defendant thought out, designed and prepared a plan to kill Evelyn Williams, and that his

premeditation was heightened." (App. A-16 at 2780.)  In support of this determination, the trial court

noted that Petitioner advised three separate individuals of his intent to kill Ms. Williams.  *Id.*

Approximately three to four days prior to the murder, he made various efforts to obtain a firearm,

including offering to trade his tools for a friend's pistol.[5]  *Id.*  Petitioner also began to watch Ms.

Williams' residence and was seen parked on her street the evening before the murders.  *Id*. at 2781.

The trial court also noted that Petitioner shot Ms. Williams three times, the last shot coming after she

had retreated and while Petitioner stood over her.  *Id.*

Petitioner argues that his threats were "primarily directed to [Amber] and her brother John."

Therefore, if his actions were in furtherance of a plan, Amber and John Williams, rather than Evelyn

Williams and Walter Burrows, would have been the victims.  In addition, Petitioner asserts that Ms.

Williams' mother testified that his threat in July of 1986 was to cut Ms. Williams and her family into

pieces; however, the murders were carried out with a firearm, rather than a knife.  Finally, Petitioner

states that he was convicted of first-degree murder with a firearm, armed burglary, and aggravated

---

[5]After the friend declined the trade, the pistol disappeared.  Petitioner had access to the pistol,
and Ms. Williams died from gunshot wounds inflicted by the same type of pistol. (App. A-16 at 2780-
81.)

assault with a firearm. Because all three crimes necessarily include use of a firearm, the application of the CCP aggravator was not warranted because "then virtually every felony murder with a firearm would automatically have an aggravating factor." (Doc. No. 15 at 5.)

This claim is subject to denial under section 2254(d). In assessing this claim on direct appeal the Florida Supreme Court correctly cited United States Supreme Court precedent for the proposition that the "aggravating circumstance 'must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Porter*, 564 So. 2d at 1063-64 (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)). Furthermore, there is no indication that the result reached by the state court was at odds with any United States Supreme Court case which considered "materially indistinguishable facts." Finally, the state court's application of the clearly established law regarding this claim was objectively reasonable.

The evidence supports the finding that Petitioner contemplated Ms. Williams' murder for a considerable time before he carried out his plan. After threatening Ms. Williams and her daughter, he watched their house, stole a gun, and told a friend she would be reading about him in the newspaper. Therefore, the application of the CCP aggravator was not constitutionally infirm, and Petitioner cannot prevail on this claim.[6]

### C.    Claim Four - Inaccurate Record

---

[6]In its response to the petition, the State indicates that Petitioner may also be asserting that he received ineffective assistance of sentencing counsel regarding this matter. (Doc. No. 21 at 30-31.) In his reply, Petitioner identifies this claim as solely involving the substantive argument raised on direct appeal. *See* Doc. No. 30 at 15 n.6.

Petitioner asserts that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated because "the record on appeal was not accurate." (Doc. No. 13 at 8.)  "New evidence reveals that portions of the trial record used in [Petitioner's] direct appeal were missing or altered." *Id.* Petitioner notes discrepancies between a transcript he received from the Titusville Clerk of Court and the record on appeal sent to the Florida Supreme Court. (Doc. No. 15 at 36-37;  Doc. No. 30 at 39-41 n. 9.)  According to Petitioner, the portions of the transcript affected include, "but [are] not limited to, the testimony of the trial pathologist, Dr. Dunn, Tim Palymale, Otto Lenke, Sandra Corey, and Amy Ambrose." (Doc. No. 15 at 36-37.)  Petitioner concludes that the record "[c]learly" was "inaccurate" and the Florida Supreme Court's consideration of such inaccuracies "mandates habeas relief." (Doc. No. 30 at 40-41.)

Petitioner raised this claim in his Rule 3.850 motion, and the state trial court denied relief, finding that the claim was procedurally defaulted as it could have been raised on direct appeal. (App. L-3 at 5.)  Petitioner appealed, and the Florida Supreme Court explicitly held this claim was procedurally barred: "[W]e find [Petitioner's] claim that the record on direct appeal was incomplete to be procedurally barred because it should have been raised on direct appeal." *Porter*, 788 So. 2d at 926 (citing *Muhammad v. State*, 603 So. 2d 488 (Fla. 1992)).  Alternatively, the court determined that the claim was refuted by the record. *Id.*

Respondents contend that this claim is procedurally barred "because it was decided on adequate and independent state procedural grounds by the Florida Supreme Court." (Doc. No. 21 at 41-42.)  Respondents are correct.  Because the state court found that the claim was procedurally barred, the claim also is barred from consideration by this Court, unless one of the exceptions applies.

In the present case, Petitioner has neither alleged nor shown either cause or prejudice that would excuse the default.  Likewise, Petitioner has neither alleged nor shown the applicability of the actual innocence exception.  A review of the record reveals that Petitioner is unable to satisfy either of the exceptions to the procedural default bar.  Thus, the claim is procedurally barred from review by this Court.

### D.   Claim Five - Ineffective Assistance of Trial and Appellate Counsel

#### 1.   *Failure to Effectively Represent Petitioner at Competency Hearing*

Petitioner contends that trial counsel rendered ineffective assistance by failing to represent him adequately at his competency hearing.  According to Petitioner, he was not competent to be tried or to plead guilty.

Petitioner raised this claim in his Rule 3.850 motion, and the trial court denied relief.  (App. L-3 at 9.)  On appeal, the Florida Supreme Court determined:

> the record reflects that as to his competency claims, the trial court went to great lengths to ensure Porter was competent to stand trial.  Specifically, the court conducted a competency hearing before the start of trial.  The record also reflects that, at the hearing, the reports of the two experts appointed to evaluate Porter were admitted into evidence, and the trial court also conducted its own extensive evaluation and thorough inquiry of Porter's rational understanding of the proceeding against him.  Moreover, after Porter had pled guilty and had attempted to commit suicide, the court again ordered psychiatric examinations of Porter.  After meeting with Porter in the hospital, Dr. J. Lloyd Wilder opined at the hearing to withdraw the guilty plea that Porter was thinking clearly and exercising competent judgment at the time he entered the plea.  On this issue, the record reflects that the trial judge not only complied with his duty to conduct a competency hearing but he undertook a conscious effort to ensure the integrity and reliability of these proceedings.

*Porter*, 788 So. 2d at 926-27.

Defendants have a substantive due process right not to be convicted while incompetent.  *Watts v. Singletary*, 87 F.3d 1282, 1290 (11th Cir. 1996).  Petitioner bears the burden of demonstrating by

a preponderance of the evidence that he was not competent at the time of his guilty pleas. *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995). The Eleventh Circuit Court of Appeals has determined that:

> "[c]ourts in habeas corpus proceedings should not consider claims of mental incompetence to stand trial where the facts are not sufficient to positively, unequivocally, and clearly generate a real, substantial, and legitimate doubt as to mental capacity of the petitioner."

*Sheley v. Singletary*, 955 F.2d 1434, 1438 (11th Cir. 1992) (quoting *Bruce v. Estelle*, 483 F.2d 1031, 1043 (5th Cir. 1973)).

The record in the instant case reflects that the state trial court ordered numerous competency evaluations of Petitioner prior to trial, prior to his pleading guilty, and after his pleas. *See, e.g.,* App. M-3 at 451-56. Competency evaluations were performed by Dr. David Greenblum, Dr. J. Lloyd Wilder, and Dr. Constance Kay on January 11, 1987; November 11, 1987; and November 16, 1987, respectively. (Doc. No. 2 at Apps. C, E, & G.) All three doctors opined that Petitioner was competent to stand trial. The state court conducted a competency hearing during which it thoroughly examined Petitioner's competency and found that he was competent to be tried and to elect to represent himself. (App. A-9 at 1570-99.) Furthermore, when Petitioner sought to withdraw his guilty pleas, the state trial court ordered another competency evaluation. Dr. Wilder evaluated Petitioner and testified at the hearing on the motion to withdraw the pleas that Petitioner was competent. (App. A-10 at 1741-42.) Thus, numerous evaluations and hearings were conducted as to Petitioner's competency, and he was deemed competent throughout the proceedings. No evidence has been presented that Petitioner was incompetent. Petitioner has failed to establish, therefore, that counsel was deficient or that he was

prejudiced by trial counsel's purported failure to adequately represent him at the competency hearing.

Accordingly, this claim is denied pursuant to section 2254(d).

2.    *Failure to Ensure Competent Mental Evaluation*

Petitioner also asserts that trial counsel rendered ineffective assistance by failing to provide

Petitioner with a competent psychiatrist to evaluate him and assist with the presentation of his defense.

Petitioner raised this claim in his Rule 3.850 motion, and the state trial court denied relief.  (App. L-3

at 10.)  Petitioner appealed the claim, *see* App. N at 66-69, and the Florida Supreme Court denied

relief, holding:

> As to the adequacy of the court-appointed experts, the record reflects that Porter was
> evaluated by two reputable doctors on several occasions.  Each time, the doctors
> opined that Porter was competent to stand trial.  Although Porter alleges that he was
> evaluated by a different mental health expert who, after examining him and reviewing
> his background, concluded that he was not competent to enter a guilty plea, Porter does
> not provide the expert's name or when any of these evaluations occurred.  Moreover,
> we have held that merely because a defendant presents a new expert who has evaluated
> a defendant after trial and who renders a different opinion than prior experts that does
> not by itself render inadequate a prior thorough evaluation.  *See, e.g., Engle v. Dugger*,
> 576 So. 2d 696 (Fla. 1991).

*Porter*,  788 So. 2d at 927.

As discussed *supra*, the state trial court appointed three doctors to evaluate Petitioner and each

of them found him to be competent.  Moreover, Petitioner does not offer any evidence to counter the

doctors' evaluations that he was competent.  Thus, he has not established that he was prejudiced by

counsel's failure to obtain a mental evaluation of Petitioner regarding his competency.  Petitioner has

failed to establish that the state courts' determination was an unreasonable application of federal law, and this claim is denied.[7]

3.      *Failure to Litigate Trial Court's Consideration of Non-Statutory Aggravators*

Petitioner asserts that trial and appellate counsel were ineffective for failing to litigate the trial court's unconstitutional consideration of non-statutory aggravators.  Petitioner maintains that the trial court improperly considered as aggravating factors the time that the murder occurred, the path of the bullet, and the number of shots fired.

Petitioner raised the ineffective assistance of trial counsel portion of this claim in his Rule 3.850 motion.  The state trial court found the claim to be procedurally barred and without merit.  *See* App. L-3 at 20.  The Florida Supreme Court affirmed.  *See Porter*, 788 So. 2d at 921.

Petitioner raised the ineffective assistance of appellate counsel portion of this claim in his state habeas petition.  Applying the standard enunciated in *Strickland*, the Florida Supreme Court denied the claim on the merits, holding:

> We conclude that Porter was not prejudiced because we find from a review of the sentencing order that the trial court only considered in aggravation the statutory aggravating circumstances.  Porter points to the discussion concerning the time of the crime, the bullet paths, and the number of gun shots by the trial court in the sentencing order.  However, this discussion was in respect to the heinous, atrocious, or cruel (HAC) aggravator finding.  *See State v. Porter*, No. 86-5546-CF-A, order at 4-5 (Fla. 18th Cir. Ct. order filed Mar. 4, 1988).  Moreover, what Porter claims as nonstatutory aggravation in actuality are simply the facts of the case.  Because the trial court did not consider nonstatutory aggravating circumstances, Porter has failed to demonstrate that his appellate counsel was ineffective for not arguing this claim on direct appeal.  *See*

---

[7]To the extent Petitioner asserts that trial counsel was ineffective for failing to obtain a mental evaluation of Petitioner for use during the penalty phase, this claim is considered *infra* in claim three.

> *Rutherford*, 774 So. 2d at 643 (holding appellate counsel is not ineffective for not arguing a claim with little or no merit).

*Porter*, 840 So. 2d at 986 (footnote omitted).

Applying clearly established federal law, the state courts found these claims to be meritless. Furthermore, the record reflects that the state trial court's consideration of the details of the crime was not an improper application of non-statutory aggravating factors, but instead merely a discussion of the facts of the case. *See* App. A-16 at 2778-80. Thus, Petitioner has failed to establish that the state courts' determinations were objectively unreasonable, and this claim is denied pursuant to § 2254(d).

>            4.       *Failure to Object to Jury Instructions*

Petitioner contends that trial and appellate counsel rendered ineffective assistance by failing to challenge the constitutionality of the penalty-phase jury instructions. Specifically, Petitioner asserts that counsel failed to object to or raise on appeal (1) the improper burden-shifting instruction; (2) the misleading instruction regarding the jury's sentencing responsibility; (3) the "especially wicked, evil, atrocious, or cruel" instruction; and (4) the "cold, calculated, and premeditated" instruction.

>            a.       *Improper Burden-Shifting Instruction*

Petitioner asserts that trial counsel and appellate counsel were ineffective for failing to challenge the penalty-phase jury instructions as improperly shifting the burden of proof. The jury instructions provided:

> . . . it is your duty to follow the law that will now be given to you by the Court and render to the Court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty.

> And whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.

(App. A-13 at 2263.)

Petitioner raised the ineffective assistance of trial counsel portion of the claim in his Rule 3.850 motion, and the state trial court determined it was procedurally barred because it could have been raised on direct appeal and was otherwise without merit.  (App. L-3 at 21.)  Petitioner appealed, and the Florida Supreme Court determined that it was procedurally barred because it could have been raised on direct appeal.  *See Porter*, 788 So. 2d at 921.  Petitioner did not raise in the state courts the ineffective assistance of appellate counsel portion of this claim.

Respondents assert  that this claim is procedurally barred from consideration by this Court. In his reply to the response to the petition, Petitioner failed to address Respondents' assertion that the claim is procedurally barred and has not argued the application of any of the exceptions to the procedural bar.  (Doc. No. 30 at 41-52.)  Thus, it appears that the claim is procedurally barred based on the state court's determination and based on Petitioner's failure to raise the ineffective assistance of appellate counsel in the state court.

Alternatively, the Court notes that the Eleventh Circuit has considered the "burden-shifting" argument in a case with virtually identical jury instructions and determined that the instruction did not improperly shift the burden to the defendant.  *See Bertolotti v. Dugger*, 883 F.2d 1503, 1524 -25 (11th Cir. 1989).   Therefore, Petitioner has not established that either trial or appellate counsel was ineffective, and this claim is denied.

  b.  *Misleading Instruction Concerning the Jury's Sentencing Responsibility*

Petitioner asserts that trial counsel rendered ineffective assistance by failing to challenge the jury instructions for unconstitutionally misleading the jury to believe that the responsibility for determining the applicability of the sentence of death rested elsewhere.  The jury was instructed:

Ladies and gentlemen of the jury, it is now your duty to advice [sic] the Court as to what punishment should be imposed upon the defendant for his crime of first degree murder.

As you've been told the final decision as to what punishment should be imposed is the responsibility of the Judge. However, it is your duty to follow the law that will now be given to you by the Court and render to the Court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty.

(App. A-13 at 2262-63.) Petitioner contends that this instruction violated the holding in *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

A review of the record indicates that this issue was neither raised in Petitioner's Rule 3.850 motion nor on appeal from the denial of the 3.850 motion. *See* App. H at 162-176; App. N at 75-86. Petitioner asserts that trial counsel failed to object to the instruction, resulting in the Florida Supreme Court finding the claim to be procedurally barred. *See* Doc. No. 15 at 52. The record reflects, however, that on direct appeal counsel raised the claim that the jury instructions violated *Caldwell*, and the state court determined the claim was meritless. *See Porter*, 564 So. 2d at 1062 n.3. Petitioner never raised the claim as one of ineffective assistance of counsel.

Respondents assert that this the claim is procedurally barred from consideration by this Court. In his reply to the response to the petition, Petitioner failed to address Respondents' assertion that the claim is procedurally barred and has not argued the application of the exceptions to the procedural bar. (Doc. No. 30 at 41-52.) This Court has no basis for recognizing an exception to the procedural bar. Moreover, the substantive issue was raised on direct appeal and found to be meritless. Given the fact that the underlying substantive portion of the claim is meritless, Petitioner cannot demonstrate prejudice; therefore, his ineffective assistance claim also fails on the merits. *See Johnston v. Singletary*, 162 F.3d 630, 643 (11th Cir. 1998) (concluding that a virtually identical jury instruction

as the one given in the instant case did not mislead the jury regarding its responsibility in sentencing the defendant). Accordingly, this claim is barred from consideration by this Court and is otherwise without merit.

c.     *Especially Wicked, Evil, Atrocious, or Cruel Instruction*[8]

Petitioner asserts that trial counsel rendered ineffective assistance by failing to object to or propose an alternative instruction to the especially wicked, evil, atrocious, or cruel aggravator instruction. The instruction provided, "The crime for which the defendant is to be sentenced is especially wicked, evil, atrocious, or cruel." (App. A-13 at 2263-64.)

Respondents assert that this claim is procedurally barred because it was never raised in the state courts. The record indicates that Petitioner raised the claim in his Rule 3.850 motion, and the Florida Supreme Court determined that it was procedurally barred. *Porter*, 788 So. 2d at 921. Because the state court found this claim to be procedurally barred and Petitioner failed to allege any basis to overcome the procedural default, the claim appears to be procedurally defaulted from consideration by this Court. *See* Doc. No. 15 at 52-53; Doc. No. 30 at 41-52.

Furthermore, to the extent Petitioner relies on *Espinosa v. Florida*, 505 U.S. 1079 (1992), the claim is without merit. *Espinosa*, which held that neither the jury nor the trial court may weigh an invalid aggravator when there is a bifurcated weighing of aggravating and mitigating factors, does not apply retroactively to cases which were final on direct appeal at the time it was issued. *See Lambrix v. Singletary*, 520 U.S. 518 (1997). Petitioner's case became final on direct appeal in 1991, prior to

---

[8]This instruction relates to the HAC aggravator.

the Supreme Court's decision in *Espinosa*.  Thus, this claim is denied as it is procedurally barred and, alternatively, without merit.

        d.    *Cold, Calculated, and Premeditated Instruction*

Petitioner contends that trial counsel rendered ineffective assistance by failing to request further instructions defining the term premeditation in the cold, calculated, and premeditated aggravator instruction.  The jury instruction provided:

> As to Count 1, the murder of Evelyn Meyer Williams, the aggravating circumstances that you may consider are limited to any of the following that is establish [sic] by the evidence . . . .

> 3.    The crime for which the defendant is to be sentenced was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

(App. A-13 at 2263-64.)

Respondents assert that this claim is procedurally defaulted.  Petitioner raised this claim in his Rule 3.850 motion, and the trial court denied relief finding that the claim was procedurally barred. (App. L-3 at 24.)  Petitioner appealed, and the Florida Supreme Court affirmed the trial court's determination.  *See Porter*, 788 So. 2d at 921.  Thus, it appears that this claim  may not be considered by this Court because it was deemed to be procedurally barred by the state courts.  Petitioner has failed to allege any basis to overcome the procedural default.  *See* Doc. No. 15 at 53-55; Doc. No. 30 at 41-52.

  Moreover, to the extent Petitioner's claim alleges that counsel was ineffective for failing to object to the instruction based on *Espinosa* and *James v. State*, 616 So. 2d 668 (Fla. 1993), this claim is without merit.  Both *Espinosa* and *James* were decided after Petitioner's conviction became final.  Counsel is not required to anticipate future developments in the law.  *Parker v. North Carolina*, 397

U.S. 790, 797-99 (1970); *Davis v. Wainwright*, 547 F.2d 261 (5th Cir. 1977).  Accordingly, this claim is denied because it is procedurally barred and otherwise without merit.

        5.    *Failure to Litigate Sentencing Judge's Failure to Find Mitigation*

Petitioner asserts that trial and appellate counsel were ineffective for failing to litigate the trial judge's failure to find mitigating factors.  Petitioner asserts that the trial court erred in not weighing the mitigating evidence argued that (1) Petitioner had a good relationship with his son, (2) Petitioner had a drinking problem and underwent a personality change when he drank , (3) Petitioner was drunk five hours before the offense, and (4) the offense was the result of a domestic dispute.  Petitioner further contends that appellate counsel was ineffective for failing to raise these issues on direct appeal.

The record indicates that trial counsel attempted to assert that Petitioner had a good relationship with his son, that he had been drinking prior to the incident, that his personality changed when he drank, and that the offense occurred as a result of a domestic dispute.  *See* App. A-13 at 2253, 2255, 2256, 2258; *see also* App. A-14 at 2399-400, 2406.  The state trial court considered the arguments and evidence presented during the penalty phase and disagreed with counsel's arguments.  *See* App. A-14 at 2449-50.  This Court cannot conclude that trial counsel rendered ineffective assistance by failing to object to the trial court's findings *in light of the mitigation evidence actually presented* or that Petitioner was prejudiced by trial counsel's performance.[9]

Additionally, appellate counsel was not ineffective for failing to raise these issues on appeal.  Appellate counsel is not required to raise every possible issue on appeal; rather, counsel must weed

---

[9]This discussion relates only to the mitigation evidence that trial counsel attempted to raise or argue during the penalty phase.  It does not, however, consider trial counsel's failure to investigate mitigation evidence or to present additional mitigation evidence, which is considered *infra* in claim three.

out the weak arguments in favor stronger positions.  *See, e.g., Smith v. Murray*, 477 U.S. 527, 536 (1986).  These sentencing issues were not strong arguments in light of the mitigation evidence presented, and appellate counsel cannot be deemed ineffective for failing to raise these issues. Accordingly, this claim is denied.

6.    <em>Failure to Litigate Prosecutorial Misconduct</em>

Petitioner asserts that trial and appellate counsel were ineffective for failing to object to or raise on appeal various instances of alleged prosecutorial misconduct.  Petitioner maintains that the following conduct was improper: (1) the prosecutor laughed at Petitioner's attempts to represent himself and made sarcastic responses to his defense; (2) the prosecutor laid on the floor to demonstrate the hypothetical position of the victim; (3) the prosecutor refused to allow Petitioner to pick up the evidence or approach the witnesses; (4) the trial judge and the prosecutor had an *ex parte* discussion; (5) the prosecutor directed the witnesses to look to the prosecution for answers during Petitioner's cross-examination; (6) the prosecutor refused to control the victim's family in the courtroom audience; and (7) the prosecutor admitted evidence of bad acts.

Petitioner raised this claim in his Rule 3.850 motion as one of prosecutorial misconduct, *see* App. L-1 at 176-79, and the state trial court denied it as procedurally barred.  (App. L-3 at 31.) Petitioner appealed, and the Florida Supreme Court determined that the claim was procedurally barred as it could have been raised on direct appeal.  *See Porter*, 788 So. 2d at 921.  Petitioner raised the ineffective assistance of appellate counsel portion of the claim in his state habeas petition.  The Florida Supreme Court considered the claim on the merits.  *See Porter*, 840 So. 2d at 984.  The court determined:

Porter contends in subclaim (a) of claim two that appellate counsel was ineffective for failing to raise improper prosecutorial antics and arguments which constituted fundamental error. In addition to events occurring prior to Porter pleading guilty, Porter alleges that an off-the-record discussion, a prosecutorial comment concerning an attorney lying on the floor, and a commotion occurring during the penalty phase closing illustrate the ineffectiveness claim. Porter's trial counsel, however, did not object to any of these items. As the items were not preserved, appellate counsel cannot be ineffective for not raising those contentions on appeal unless those contentions constituted fundamental error. *See Spencer v. State*, 27 Fla. L. Weekly S323 (Fla. April 11, 2002). We have explained:

> In order for an error to be fundamental and justify reversal in the absence of a timely objection, "the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." In order for improper comments made in the closing arguments of a penalty phase to constitute fundamental error, they must be so prejudicial as to taint the jury's recommended sentence.

*Id*. at S329 (quoting *Brown v. State*, 124 So. 2d 481, 484 (Fla. 1960)).

Porter asserts that appellate counsel was ineffective for failing to raise as an appellate point an off-the-record discussion that constituted fundamental error. The off-the-record discussion concerned a brief conversation between the prosecutor and the trial judge during the penalty phase. The prosecutor became upset at one of the trial judge's rulings. In order to not embarrass the prosecutor, the trial judge requested the prosecutor to step outside to calm down. The trial judge followed the prosecutor out into the hallway, whereupon the prosecutor indicated that the trial judge was "sanitizing" the proceedings by preventing the jury from hearing the true horrific nature of the murders. The trial judge immediately ceased the conversation. Shortly thereafter, in chambers and on the record, the trial judge disclosed to defense counsel, Porter, and the prosecutor what had occurred and offered defense counsel the ability to voir dire the trial judge and prosecutor. Defense counsel declined the offer and stated that Porter suffered no prejudice. Porter has failed to demonstrate how this encounter prejudiced him. Clearly, the jury was unaware of the encounter and still recommended death by a vote of twelve to zero. Nor is there a basis to reasonably conclude that this encounter prejudiced the trial judge. This claim does not constitute fundamental error.

Porter's next fundamental error contention is that the prosecutor made reference to the fact that during the guilt phase, the prosecutor acted as a mannequin to illustrate the path of the bullets through the victim's body. Porter asserts that the prosecutor's conduct was highly improper and inflammatory. We have examined the brief

statement by the prosecutor in its context, and we conclude the remark did not constitute fundamental error. *See Jones*, 794 So. 2d at 589 (finding prosecutorial argument which in that case was more egregious did not constitute fundamental error).

Porter also contends that there was a courtroom commotion occurring [sic] during the prosecutor's penalty phase closing argument, and appellate counsel should have raised that issue on appeal. The record reflects that the trial judge interrupted the prosecutor during the prosecutor's penalty phase closing argument and sent the jury outside. At that point, the trial judge addressed the courtroom audience and requested that the audience members not stare at the defendant and otherwise maintain their composure by not crying. The trial judge then stated that he had been watching the jury and that the jury had not seen any disturbance. There is no basis to reasonably conclude that the trial judge's statement was incorrect or that the jury's unanimously recommended death sentence was tainted. We have examined the totality of Porter's contentions and conclude that none of them singularly or collectively constitute fundamental error. Thus, we conclude this subclaim is meritless.

*Porter*, 840 So. 2d at 984 -85 (footnote omitted).

In his Rule 3.850 motion, Petitioner raised the prosecutorial misconduct claim but did not characterize it as one of ineffective assistance of counsel. *See* App. L-1 at 176-79 & App. N at 88-90. The state court addressed the prosecutorial misconduct argument and found it to be procedurally barred. *See Porter*, 788 So. 2d at 921 n.6. Thus, Petitioner did not raise the ineffective assistance of trial counsel portion of this claim in the state courts, and it is procedurally barred from review by this Court absent an exception to the application of the procedural bar. Petitioner has not alleged or established that any exception exists to overcome application of the procedural default rule. *See* Doc. No. 15 at 56-58. Therefore, the claim that trial counsel was ineffective for failing to object to alleged instances of prosecutorial misconduct is procedurally defaulted.

　　　　7.　　*Sentencing Counsel's Improper Closing Argument*

Petitioner further asserts that appellate counsel rendered ineffective assistance by failing to raise on direct appeal trial counsel's deficient performance during the penalty-phase closing

argument.[10]  Petitioner raised this claim in his state habeas petition.  The Florida Supreme Court

denied relief, finding that the claim was extensively addressed in the Rule 3.850 proceedings as it

related to trial counsel's assistance during the penalty phase.  *Porter*, 840 So. 2d at 984 n.3.  Thus, the

state court concluded that the ineffective assistance of appellate counsel claim was a variant of the

ineffective assistance of trial counsel claim and was  procedurally barred.  *Id.*

Under Florida law, generally, the adequacy of trial counsel's representation cannot be raised

for the first time on direct appeal.  *Bruno v. State*, 807 So. 2d 55, 63 (Fla. 2001).  Instead, the proper

vehicle for such a claim is through a motion for post-conviction relief pursuant to Rule 3.850.  *Baker*

*v. State*, 937 So. 2d 297, 299 (Fla. 4th DCA 2006).  "An exception to the general rule exists where

both counsel's deficient performance and the prejudice to the defendant are apparent on the face of

the record."  *Grant v. State*, 864 So. 2d 503, 505 (Fla. 4th DCA 2004).

The Court cannot conclude that the inadequacy of trial counsel that Petitioner asserts should

have been raised on direct appeal was apparent on the face of the record.  During the penalty phase,

counsel mentioned Petitioner's mental state, the volatile relationship of Petitioner and the victim,

Petitioner's alcohol problem, Petitioner's relationship with his son, and Petitioner's alcohol use prior

to the incident.[11]  *See* App. A-13 at 477-85.  Thus, the record reflects that, trial counsel raised

nonstatutory mitigation factors at the penalty phase.  Furthermore, to the extent Petitioner is alleging

---

[10]To the extent Petitioner attempts to assert that trial counsel rendered ineffective assistance
by failing to argue non-statutory mitigating factors during closing argument, this claim is addressed
*infra* in claim three.

[11]This discussion is limited to appellate counsel's performance and in no way addresses trial
counsel's performance during the penalty phase.  Instead, trial counsel's performance during the
penalty phase is addressed in the context of claim three *infra*.

that appellate counsel did not raise trial counsel's failure to raise mental health mitigation evidence, the Court notes that an evidentiary hearing was required to determine whether such mitigation evidence was available.  Therefore, Petitioner has not shown that appellate counsel's failure to pursue the argument prejudiced him.  Appellate counsel was not deficient, and Petitioner suffered no prejudice by the omission of this matter on direct appeal.  Accordingly, this claim is denied.

### E.  Claim Six - Waiver of Counsel

Petitioner contends that he was not competent to represent himself and his "waiver of counsel was not knowing and voluntary."  (Doc. No. 13 at 11;  Doc. No. 15 at 59-66;  Doc. No. 30 at 52-54.) Petitioner raised this claim in his Rule 3.850 motion, and the state trial court denied the claim without an evidentiary hearing.  In affirming the trial court's summary denial of this claim, the Florida Supreme Court reasoned as follows:

> Porter alleges that the trial court erred in summarily denying his claim that the court conducted an inadequate *Faretta* inquiry to determine whether Porter's waiver of counsel was voluntary, knowing, and intelligent.  He further claims that the trial court applied the wrong standard for determining a defendant's competency to waive counsel.  We disagree with both of his claims.  In *United States v. Fant*, 890 F.2d 408 (11th Cir. 1989), the court outlined the following factors to be considered in determining whether a defendant made a knowing and voluntary waiver:
>
> > (1) the background, experience and conduct of the defendant including his age, educational background, and his physical and mental health; (2) the extent to which the defendant had contact with lawyers prior to trial; (3) the defendant's knowledge of the nature of the charges, the possible defenses, and the possible penalty; (4) the defendant's understanding of the rules of procedure, evidence and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which he aided the defendant; (7) whether the waiver of counsel was the result of mistreatment or coercion; or (8) whether the defendant was trying to manipulate the events of the trial.
>
> The transcripts in the instant case reflect that the trial judge conducted several extensive inquiries of defendant which covered all of the areas outlined in *Fant*.  He

inquired as to Porter's knowledge and familiarity with the legal system and also discussed Porter's mental conditions and the dangers and disadvantages associated with Porter representing himself.  Therefore, the record clearly refutes Porter's claim on this issue, and, therefore, no evidentiary hearing was required.  Porter's claim as to the standard for determining competency is without merit.

*Porter*, 788 So. 2d at 927 (footnotes and citations omitted) (citing *Godinez v. Moran*, 509 U.S. 389, 399 (1993)).

Because the state courts considered this claim on the merits, this Court's analysis is circumscribed by § 2254(d).  The state court, citing both *Faretta v. California*, 422 U.S. 806 (1975), and *Godinez v. Moran*, 509 U.S. 389 (1993), applied clearly established federal law when denying this claim.  As explained below, the state court's application of this clearly established federal law and its findings of facts were objectively reasonable.  Accordingly, claim six withstands review under section 2254(d).

Criminal defendants have a constitutional right to self-representation but must competently, knowingly, intelligently, and voluntarily waive the right to counsel.  *Faretta*, 422 U.S. at 819-21; *e.g.*, *Godinez*, 509 U.S. at 397 (holding that a defendant may not waive his right to counsel unless he does so "competently and intelligently").  The competency standard for waiving the right to counsel is exactly the same as the competency standard for standing trial:  whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has

"a rational as well as factual understanding of the proceedings against him."[12]  *Id.* (quoting *Dusky v. United States,* 362 U.S. 402 (1960)).

In the instant case, as noted *supra* in claim five, the state courts correctly found that Petitioner was competent to stand trial.  Accordingly, under clearly established law, Petitioner was likewise competent to waive his right to counsel.  *Godinez*, 509 U.S. at 397.  Petitioner's suggestion that a different standard applies for competency to represent oneself and that Petitioner did not have that level of competency is not supported by the law or by clear and convincing record evidence.

The state courts also correctly found that Petitioner knowingly, intelligently, and voluntarily waived his right to counsel.  The record amply supports the state courts' finding that the trial court made "extensive inquiries" into all areas relevant to a proper waiver and that the trial court made Petitioner aware of the dangers and disadvantages of self-representation.  Furthermore, the record reflects that the trial judge regularly questioned Petitioner during trial as to his physical and mental well-being as well as his understanding of the proceedings.  (Appendix A-5 at 894; App. A-6 at 1040, 1065-66, 1185; App. A-7 at 1269; & App. A-8 at 1467 (confirming that Petitioner was physically and mentally "alert" and "well" and confirming Petitioner's understanding of authentication requirement).)  The record also refutes Petitioner's contention he "had very little understanding of the rules of procedure, evidence, and courtroom decorum."  (Doc. No. 15 at 64.)  Throughout the trial, Petitioner made appropriate objections that were sustained by the trial court.  (Appendix A-3 at 480-84

---

[12]The competency standard is the same because "there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights."  *Godinez*, 509 U.S. at 399 (making "clear that the defendant's 'technical legal knowledge' is 'not relevant' to the determination whether he is competent to waive his right to counsel").

(sustaining objection); *id.* at 526 (sustaining objection regarding sequestration of witnesses); *id.* at 566, App. A-4 at 709, & App. A-5 at 912 (sustaining hearsay objections); App. A-4 at 625 & App. A-6 at 1173 (sustaining objection to leading questions); App. A-5 at 917 (sustaining relevance objection); *id.* at 930 (sustaining objection based upon inadequate foundation).) Finally, the record is clear that Petitioner was provided with stand-by counsel who repeatedly consulted with Petitioner and assisted him with legal issues that arose during trial. (App. A-7 at 1292 & 1300.) Based upon this record, there is no basis to conclude that the state courts erred in finding a knowing, intelligent, and voluntary waiver of Petitioner's right to counsel. Accordingly, this claim is denied.

### F.    Claim Seven - Disproportionate Sentence

In claim seven, Petitioner avers that his death sentence violates the Eighth and Fourteenth Amendments because it is disparate, arbitrary, and capricious. According to Petitioner, the evidence establishes that "this was not one of the most aggravated and least mitigated crimes and renders his death sentence disproportional, disparate, and arbitrary in light of other capital defendants who are similarly situated and received life sentences in Florida." (Doc. No. 15 at 67.) Petitioner contends that this disparate treatment violates the Equal Protection Clause of the Fourteenth Amendment.

Petitioner raised a proportionality argument on direct appeal; however, that claim was premised on state law, rather than the Equal Protection Clause. In his state habeas petition, Petitioner asserted the same proportionality claim as contained in the instant petition. The Supreme Court of Florida specifically found that the claim was procedurally barred because it was raised on direct appeal.

Petitioner contends that the state court's procedural bar was based on the erroneous assumption that the state habeas claim had been raised on direct appeal. He argues that the instant claim was fairly

presented to the state courts as a federal constitutional claim and is ripe for determination by this Court.

Although it does appear that the Florida Supreme Court may have erroneously assumed that the state habeas claim was the same as the claim raised on direct appeal, such a mistake does not necessarily preclude application of the procedural bar.  As noted by the Florida Supreme Court, Florida law does not permit habeas review of a variant to a claim previously decided.  *See Porter*, 840 So. 2d at 984 (citing *Jones v. Moore*, 794 So. 2d 579, 586 (Fla. 2001)).  Because Petitioner's proportionality claim in his state habeas petition was a variant of the claim raised on direct appeal, under Florida law the claim was procedurally barred from consideration on state habeas review. Therefore, the Florida Supreme Court's application of the procedural bar was appropriate.  Because the state court found that the claim was procedurally barred, the claim is also barred from consideration by this Court, unless one of the exceptions applies.

In the present case, Petitioner has neither alleged nor shown either cause or prejudice that would excuse the default.  Likewise, Petitioner has neither alleged nor shown the applicability of the actual innocence exception.  A review of the record reveals that Petitioner is unable to satisfy either of the exceptions to the procedural default bar.  Therefore, claim seven is procedurally barred.

G.    **Claim Eight - *Ring v. Arizona***

Petitioner contends that his death sentence runs afoul of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002).  Specifically, he argues that the harmless error analysis undertaken by the Florida Supreme Court after it struck the HAC aggravating factor did not comport with the requirements of these four constitutional provisions.  In addition, he argues that the Sixth and Fourteenth Amendments were

further violated by the failure to have a jury trial on each element of his capital offense and the failure to provide him with notice of the elements of the capital offense. (Doc. No. 13 at 14; Doc. No. 15 at 69-73.) Petitioner raised the basic claims regarding the failure to have the elements of the capital offense considered by a jury and the failure to provide him with notice of the elements of a capital offense in his state habeas petition, *see* App. T at 36-43, and the Florida Supreme Court denied relief. *See Porter*, 840 So. 2d at 986. Petitioner, however, did not raise the constitutionality of the harmless error analysis in the state court. Normally, the failure to raise the claim in the state courts results in a procedural bar. Because the State has not raised the procedural bar regarding this claim, the Court will not address its applicability.

In *Ring*, the United States Supreme Court held that "a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty." *Ring*, 536 U.S. at 609. Instead, "the Sixth Amendment requires that [those circumstances] be found by a jury." *Id.* However, *Ring* does not apply retroactively to cases which were already final on direct appeal at the time *Ring* was issued. *See Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

In the instant case, Petitioner's case became final on direct appeal in 1991, over ten years before the Supreme Court's decision in *Ring*. The holding in *Ring*, therefore, cannot be applied to this case, and claim eight must be denied.

### H.    Claim Nine - Cumulative Error

Petitioner argues that even if no single error warrants habeas corpus relief, the cumulative effect of the procedural and substantive errors alleged throughout his petition deprived him of a fundamentally fair trial. He specifically states that "[t]he errors individually and cumulatively in [his] trial, sentencing, and direct appeal deprived him of effective assistance of counsel, his right to counsel,

assistance of competent mental health assistance, a fundamentally fair trial, due process of law, and individualized sentencing under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." (Doc. No. 15 at 73.)

The Eleventh Circuit Court of Appeals has recognized that in reviewing a habeas petition, "[a] piecemeal review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution." *United States v. Blasco*, 702 F.2d 1315, 1329 (11th Cir. 1983). After reviewing the proceedings and considering the claims collectively, this Court cannot conclude that the guilt phase of Petitioner's "trial, as a whole, was fundamentally unfair and outside the bounds of the Constitution." *Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004). Because this Court concludes that Petitioner is entitled new penalty phase proceedings, as set forth in connection with claim three, the cumulative error argument with regard to the penalty phase of Petitioner's trial is rendered moot. Therefore, claim nine must be denied.

## I.      Claim Three - Ineffective Assistance of Penalty-Phase Counsel

Petitioner claims he received ineffective assistance of counsel during the penalty phase of his trial because his counsel, Sam Bardwell ("Bardwell"), did little, if anything, to rebut the State's case (the aggravators) and presented minimal mitigating evidence even though such evidence was available. Petitioner contends that effective counsel would have presented evidence that would have had a significant impact on the jury's recommendation and the sentencing judge's ultimate decision.

### 1.      *Deficient Performance*

As an initial matter, the Court notes that the state courts did not determine whether trial counsel's failure to investigate and present mitigation evidence during the penalty phase constituted

deficient performance under the first prong of *Strickland*.  Because the state courts did not determine this element on the merits, § 2254(d) does not govern this Court's analysis of counsel's performance.  Accordingly, the Court will first consider whether counsel's performance was deficient as contemplated by *Strickland*.

To determine whether counsel's performance was lacking at the penalty phase, courts must consider "'whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court.'"  *Stewart v. Secretary, Dept. of Corrections,* 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006)).  "[C]ounsel's decision not to investigate and develop favorable evidence must be reasonable and fall within the range of professionally competent assistance.  Strategic choices to forego further investigation into an issue are not deficient when a reasonable professional judgment based on a sufficient initial inquiry supports the decision to terminate the investigation."  *Lynd v. Terry*, 470 F. 3d 1308, 1316-17 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).  Counsel is deficient when he or she "'totally fails to inquire into the defendant's past or present behavior or life history' in a capital case. . . ."  *Lynd*, 470 F.3d at 1317 (quoting *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001)); *see also Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) (holding that representation is deficient when counsel does not conduct sufficient investigation to formulate an adequate life profile of a defendant).

A capital defendant is entitled to competent counsel, and the lack of such may make the sentencing proceeding fundamentally unfair and unreliable.

> The primary purpose of the penalty phase is to insure that the sentence is individualized by focusing on the particularized characteristics of the defendant.  By failing to provide such evidence to the jury, though readily available, trial counsel's

deficient performance prejudices a petitioner's ability to receive an individualized sentence. The Eleventh Circuit has enunciated the rule that effective representation, consistent with the sixth amendment, also involves the independent duty to investigate and prepare.

Counsel's duty of inquiry in the death penalty sentencing phase is somewhat unique. First, the preparation and investigation for the penalty phase are different from the guilt phase. The penalty phase focuses not on absolving the defendant from guilt, but rather on the production of evidence to make a case for life. The purpose of investigation is to find witnesses to help humanize the defendant, given that a jury has found him guilty of a capital offense. Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Even where a client is recalcitrant, courts have been ambivalent in whether counsel is relieved of *any* further duty of investigation, particularly where the client exhibits signs of instability.

*Hardwick v. Crosby*, 320 F.3d 1127, 1162-63 (11th Cir. 2003) (internal quotations and citations omitted) (emphasis in original). Failure to investigate is the talisman of ineffective assistance of counsel. *See Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir. 1994); *Williams,* 529 U.S. at 396 (holding "that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision" because counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background").

In this case, penalty-phase counsel did little, if any, investigation of Petitioner's mental health issues, history of being abused as a child, and many years of military service. Furthermore, Petitioner's counsel failed to effectively advocate on behalf of his client before the jury.[13] *See Porter*, 788 So. 2d at 931 (Anstead, J., dissenting). "The Sixth Amendment . . . envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Strickland*, 466

---

[13]Not only was this Bardwell's first penalty phase representation, Bardwell did not even recall if he had been assigned to be Petitioner's counsel during the penalty phase, rather than just his standby counsel. (App. M-17 at 44, 61.) However, the record makes it clear that Bardwell was representing Petitioner throughout the penalty phase. (App. A-11 at 1782-83, 1790.)

U.S. at 685.  "That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command."  *Id*.  The entire basis of this right envisions an advocate who is more equipped to present his client's defense than a layman would be.  *See Penson v. Ohio*, 488 U.S. 75, 84 (1988).  Yet, a review of the record reflects that Bardwell was completely ineffective in front of the jury – mixing up or being unaware of basic facts, eliciting irrelevant testimony, and making incoherent arguments.

For example, while cross-examining Amber Williams, Bardwell was unaware of how many brothers she had, or what their names were.  (App. A-11 at 1838-39.)  Even a cursory review of the prior testimony would have revealed this information.  It is inexcusable for counsel to be unaware of the basic facts of the case at hand, particularly at such a late stage in these very serious proceedings.  Bardwell was equally unprepared to cross-examine the State's expert witnesses.  Bardwell questioned the State's ballistics expert about how far one would have to pull a trigger on a particular weapon to make it fire.  Even after the witness indicated he did not know that information, Bardwell persisted in the line of questioning for no apparent reason.  (App. A-11 at 1906-19.)  There was never any demonstration that the trigger of the gun had any bearing on the sentencing proceedings.  Also, when questioning the State's blood spatter expert, Bardwell continually asked questions about evidence that was not in the record and had not been addressed by the witness and, again, failed to link the line of questioning to Petitioner's sentence.  (App. A-11 at 1950-69.)

Bardwell attempted to present only two witnesses at the penalty phase: Patricia Porter ("Ms. Porter") and Lawrence Jury ("Jury").  Bardwell seemingly never spoke to Ms. Porter, Petitioner's ex-wife, before calling her to testify.  His direct examination of Ms. Porter focused on Petitioner's drinking habits.  She testified that his personality did not change when he was intoxicated and that

most people would not be able to tell the difference between a drunken Petitioner and a sober Petitioner.  (App. A-12 at 2041-46.)  This testimony was actually harmful to Bardwell's minimal attempt to show that intoxication should be seen as a mitigating factor in this case.  Bardwell had attempted to show that Petitioner was like Dr. Jekyll and Mr. Hyde, and when he drank Mr. Hyde came out and he could not control his temper or actions. Ms. Porter's testimony was contrary to that argument.[14]

Next, Bardwell attempted to present Jury's testimony.  Jury was one of Petitioner's friends, who had testified for the State during the guilt phase.  Jury, however, did not show up to testify at the penalty phase because he could not obtain transportation.  After being granted a delay, Bardwell opted to read a portion of Jury's deposition testimony into the record.[15]  (App. A-12 at 2056.)  The published testimony indicated that Petitioner was severely affected by alcohol and was quite drunk at 11:00 p.m. on October 8, 1986 – just hours before the murders.  (App. A-12 at 2070.)  Jury's deposition testimony was supportive of the Dr. Jekyll and Mr. Hyde theory because he stated that Petitioner's personality changed when he drank; however, this testimony was minimally effective as it was out of context and read from a transcript.  Additionally, Bardwell had already discredited the Dr. Jekyll and Mr. Hyde theory by calling Ms. Porter, who gave live testimony to the contrary.

---

[14]Ms. Porter did indicate that Petitioner was a good father to their son, testifying that he visited him whenever he had a chance and had a good relationship with the ten year-old boy.  (App. A-12 at 2043-44.)

[15]With his client's life at stake, one wonders how much trouble it would have been for Bardwell to arrange transportation for Jury.

Bardwell did not present any other witnesses.[16] He did attempt to introduce sentencing reports from other death penalty cases into evidence, but this was not allowed, and Bardwell admitted that Florida law was contrary to his request. (App. A-12 at 2028-32.)

In his closing argument to the jury, Bardwell argued that the HAC factor was inappropriate because Petitioner did not intend to intensify the victim's pain.[17] (App. A-13 at 2251-55.) He also stated that Petitioner had a drinking problem; however, Bardwell presented no evidence to show that Petitioner was an alcoholic and no evidence that alcoholism contributed to his homicidal conduct.[18] (App. A-13 at 2251-55.) Finally, Bardwell mentioned that Petitioner was not "mentally healthy," but presented no evidence or expert testimony to support this claim. (App. A-13 at 2251-55.)

At the final sentencing hearing before the state trial judge, Bardwell's ineffective assistance was starkly evident. It was clear from the colloquy between the state trial judge and Petitioner that Petitioner was very confused about Bardwell's role in the proceedings. (App. A-14 at 2386-96.) Petitioner indicated that he wanted Bardwell to argue for him, but did not know what to tell him to say. (App. A-14 at 2392-93.) It appears that Bardwell did not discuss any tactics with Petitioner or prepare him in any way. If he had, and Petitioner still did not understand, Bardwell should have brought that to the attention of the trial court. Petitioner indicated that he had been put on medication for his "nerves," but Bardwell did not explore this issue either. (App. A-14 at 2389.) Instead,

---

[16]Bardwell suggested that he had subpoenaed Petitioner's ex-girlfriend, Loretta Clouser, who was called by the State, and that Clouser did not respond to the subpoena. (App. A-12 at 2092.) However, no subpoena was entered into the record to corroborate this claim, and Clouser denied ever receiving a subpoena from Bardwell.

[17]The Florida Supreme Court eventually agreed with this argument.

[18]Bardwell's attempt to use an addictionologist seemingly was limited to the guilt phase.

Bardwell stood idly by while his client testified, struggled in his colloquy with the trial judge, and expressed uncertainty about the proceedings.  After some persuasion by the trial judge, Petitioner agreed to let Bardwell argue on his behalf to the trial court.  (App. A-14 at 2397.)  Unfortunately, Bardwell was entirely unprepared for this task.  His argument was largely incoherent and disorganized. Bardwell attempted to argue in support of two mitigating factors: extreme emotional disturbance and intoxication.  Bardwell also attempted to argue against the State's aggravators, however, his arguments relied on unsupported presumptions and opinions that were not in evidence.[19]

The Florida Supreme Court noted that Petitioner instructed his counsel not to investigate his past or speak to his family members, and, therefore, counsel did the best he could with an uncooperative client.  This bold conclusion, however, is not supported by the evidence.  At the 3.850 evidentiary hearing, Bardwell testified that Petitioner was "fatalistic," that he was "ready to die," and that he did not want Bardwell to present any evidence or call any witnesses on his behalf at the penalty phase of the trial.  (App. M-17 at 43.)  However, Bardwell's testimony regarding Petitioner's cooperation is inconsistent in many respects.  Furthermore, "[t]he duty to investigate exists regardless of the [client's] admissions or statements to the lawyer" no matter how fatalistic they may be. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

Bardwell indicated that his only meeting with Petitioner to discuss the penalty phase was very short, and Petitioner stated only that he did not want Bardwell talking to his ten year-old son and that he did not want to testify on his own behalf.  (App. M-17 at 76-78.)  It appears that Bardwell did

---

[19]For example, Bardwell indicated that he knew from his "relatives" that gunshot wounds are not all that painful.  (App. A-14 at 123-24.)  Bardwell admitted, however, that he had never spoken to anyone who had died from a gunshot wound.  (App. A-14 at 124.)  Frankly, in light of the rest of the record in this case, this Court would not be surprised if he claimed that he had.

nothing after that to act as an advocate for his client.  He did no investigation into his background and did not ask him to meet with a mental health professional.  Bardwell did testify that he hired an expert on addiction to evaluate Petitioner's alcoholism, but that Petitioner refused to meet with him.  (App. M-17 at 71-73.)  However, this was done during the guilt phase of the trial, not the penalty phase. Bardwell testified that he felt that any investigation he did would have been futile because nothing could be introduced without Petitioner testifying and admitting that he was at the murder scene that night.  (App. M-17 at 94.)  This excuse, however, is not even logical because Petitioner's presence at the scene was an established fact and did not need to be verified during the penalty phase. Furthermore, counsel's failure to investigate mitigating evidence due to a mistaken belief about the applicable law "is indisputably below reasonable professional norms."  *Hardwick,* 320 F.3d at 1163.

Perhaps the biggest flaw in Bardwell's testimony is his repeated attempt to use Petitioner's spontaneous testimony to excuse his deficient representation.  Bardwell testified that, during the penalty phase, Petitioner jumped up without notice and announced he was going to testify.  (App. M-17 at 85.)  Bardwell stated that Petitioner's testimony included vulgar comments about Williams' daughter and so tainted the jury against him that it would have far outweighed any mitigating evidence.  However, Bardwell eventually admitted that Petitioner's vulgar statements were not made in the presence of the jury.[20]  (App. M-17 102-104.)  Bardwell admits that he conducted no independent investigation, did not speak to any of Petitioner's family members, and did not even know

---

[20]It appears that Bardwell is referring to Petitioner's testimony at the sentencing hearing held before the state trial judge on February 22, 1988.  (App. A-14 at 84-106.)  However, Petitioner did not jump up and get on the stand as Bardwell claimed at the 3.850 Hearing.  Instead, Petitioner indicated to counsel privately that he wanted to testify and met with Bardwell in private for 15 minutes before doing so.  (App. A-14 at 47, 82.)

that Petitioner had been in the military.[21]  (App. M-17 at 77, 86, 87.)  Bardwell made little effort to discredit the State's witnesses, only argued the existence of two mitigating factors at the sentencing hearing (alcohol use and extreme emotional disturbance) for which he had either offered no evidence or contradictory evidence, and never indicated to the trial court that his client's uncooperative attitude was preventing him from assisting Petitioner effectively.

Under prevailing professional norms, Bardwell should have met with Petitioner on more than one "short" occasion, and he should have conducted as much investigation as reasonably possible under the circumstances.[22]  Counsel did virtually nothing to defend against the death penalty except to make argument regarding proportionality.  The only mitigators that Bardwell attempted to support with actual evidence were (1) that Porter had a good relationship with his son and (2) that Porter abused alcohol, however, this evidence was inconsistent and, therefore, ineffective.  He failed to explore, investigate, or even consider the possibility that other mitigating evidence might be available.[23]  His expressed reason for this was that Petitioner was "fatalistic."  Thus, because his client was willing to accept his fate (execution), there was no point in introducing evidence of mitigation.  Yet, this conflicts with Bardwell's own admission that a capital defendant cannot waive a judicial

---

[21]This is inexcusable because Petitioner mentioned his military history and service in the Korean War in open court, and in front of Bardwell, at his competency hearing. (App. A-9 at 7). Furthermore, this evidence was contained in Petitioner's pre-sentence investigation report.

[22]"[I]nvestigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

[23]"Trial counsel performs deficiently by not providing readily available mitigating evidence to the jury at the penalty phase because he prejudices a convicted defendant's receiving an individualized sentence." *Hardwick,* 320 F.3d at 1163.

determination imposing the death penalty. (App. M-9 at 45.) Bardwell's acquiescence to Petitioner's fatalistic attitude amounts to a *de facto* waiver. Therefore, by Bardwell's own admission, his assistance was ineffective. After a thorough review of the record, this Court finds that the first *Strickland* factor has been met.

        2.    *Prejudice*

      The state courts concluded that Petitioner failed to establish that he was prejudiced by counsel's failure to investigate and present mitigating evidence.  This portion of the ineffective assistance analysis must be reviewed in accordance with the provisions of the AEDPA.  However, this statute does not require district courts to uphold a state court decision simply because a reasonable judge could reach that same conclusion.  In discussing the application of § 2254(d), the United States Supreme Court stated:

> [I]t is significant that the word "deference" does not appear in the text of the statute itself. . . . Whatever "deference" Congress had in mind with respect to both phrases, it surely is not a requirement that federal courts actually defer to a state-court application of the federal law that is, in the independent judgment of the federal court, in error.

*Williams*, 529 U.S. at 386-87.  In responding to Justice O'Connor's concurring opinion in *Williams*, the majority goes on to explain:

> We all agree that state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated.  Our difference is as to the cases in which, at first-blush, a state-court judgment seems entirely reasonable, but thorough analysis by a federal court produces a firm conviction that that judgment is infected by constitutional error.  In our view, such an erroneous judgment is "unreasonable" within the meaning of the act even though that conclusion was not immediately apparent.
>
> In sum, the statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law.  If, after carefully weighing all the

reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody – or, as in this case, his sentence of  death – violates the Constitution, that independent judgment should prevail.  Otherwise the federal "law as determined by the Supreme Court of the United States" might be applied by the federal courts one way in Virginia and another way in California.  In light of the well-recognized interest in ensuring that federal courts interpret federal law in a uniform way, we are convinced that Congress did not intend the statute to produce such a result.

*Id.* at 389-90.

To determine prejudice from the unreasonable failure to investigate and present favorable and/or mitigating evidence, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins,* 539 U.S. at 534.  The critical issue is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  This analysis requires the Court to evaluate the totality of the available mitigation evidence – both that presented at trial and at the collateral proceedings. *Williams,* 529 U.S. at 397-98.  If "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's] moral culpability," *Wiggins*, 539 U.S. at 538, then prejudice has been shown.

    a.    *Evidence at Trial*

At the penalty phase of the trial, the State presented evidence of four aggravating factors: (1) the defendant had been previously convicted of another capital felony or a felony involving the use or threat of violence to the person; (2) the capital felonies were committed while the defendant was engaged in the commission of a burglary; (3) the murder was especially heinous, atrocious, or cruel; and (4) the murder was committed in a cold, calculated, and premeditated manner.  The defense

presented evidence of only one, non-statutory mitigator – alcohol abuse.  Based on this evidence, the

jury returned a unanimous verdict for death as to the Williams murder and a 10-2 verdict for death as

to the Burrows murder.  In rendering a death sentence for the Williams murder, the trial judge found

four aggravators and no mitigators.  The trial judge correctly characterized two of the aggravators as

"technical" and found both the heightened premeditation and the HAC factors inapplicable to the

Burrows murder.[24]  Subsequently, the Florida Supreme Court ruled that the HAC aggravator was not

supported by the evidence.  *Porter,* 564 So. 2d at 1063.  Thus, the aggravation evidence at trial boiled

down to two technical aggravators and heightened premeditation, itself a rather esoteric concept.[25]

      b.    *Effective Evidence Presentation*

Effective counsel would have produced various forms of mitigating evidence, both statutory

and non-statutory.  Evidence of two statutory mitigators was presented at the 3.850 hearing:  (1) that

Petitioner was suffering from extreme emotional disturbance at the time of the murder and (2) that

Petitioner suffered from a mental condition which substantially impaired his ability to comply with

the law.  Both of these mitigators involve various mental health issues.  In this regard, Petitioner called

Dr. Henry Dee as a witness during the 3.850 hearing.  Dr. Dee, a highly qualified expert in the field

of forensic neuropsychology, testified that he reviewed records of Petitioner's history, interviewed

him, and administered various accepted psychological tests.  He found that Petitioner had a low IQ

---

[24]Accordingly, Petitioner received a life sentence for the Burrows murder.

[25]It is difficult to discern the difference between premeditation (an element of the offense) and heightened premeditation, a statutory aggravating factor.  A professional assassin would of course fit the statutory aggravating factor.  But, such is not the case here.  Someone can think well in advance about killing someone, even threaten to do so, without ever following through.  That same person may cross the line and act on that intent based on a more proximate event, such as the loss of inhibition through alcohol abuse.  Is this heightened premeditation as contemplated by the statute?

and limited education and offered a diagnosis of "organic brain syndrome." (App. M-10 at 233.) He stated that this condition could manifest itself as deficient impulse control and violent acting-out and could be caused or aggravated by alcohol abuse. (App. M-10 at 233-34.)

In addition to these statutory mitigators, effective counsel would also have presented other non-statutory mitigating evidence of Petitioner's abuse as a child, military service and alcoholism. The availability of this mitigating evidence was established at the 3.850 hearing.

In the state court collateral proceedings, this evidence was rejected. With respect to Petitioner's mental impairment, *i.e.,* the statutory mitigating evidence, the trial court determined that Dr. Dee's testimony was not credible and dismissed it in reliance on the testimony of Dr. William Riebsame, a forensic psychologist called by the State. Unlike Dr. Dee, Dr. Riebsame never met or examined Petitioner nor did he administer any tests.[26] Although he was critical of some of Dr. Dee's methods,[27] he conceded that the results of the tests administered by Dr. Dee were essentially reliable and that the results were consistent with Dr. Dee's diagnosis. Furthermore, despite disagreeing with Dr. Dee's opinion, he conceded that he could not render a diagnosis because, "I would be reluctant to diagnose someone I haven't examined."[28] (App. M-10 at 345.) Rather, Dr. Riebsame simply

---

[26]Dr. Riebsame spent a total of ten hours preparing for his testimony, and was not provided with a complete record by the State. (App. M-10 at 345, 362.)

[27]For example, Dr. Riebsame contends that Dr. Dee should have attempted to administer the MMPI test verbally, to rule out malingering. However, he concedes that there was substantial collateral evidence that Petitioner was not malingering during the testing process. (App. M-10 at 363.) Dr. Dee did attempt to administer the MMPI, but Petitioner left too many answers blank for it to be useful, presumably because he could not read and understand the questions. (App. M-10 at 235-36.) Dr. Dee believed that a second attempt to administer the test verbally would have produced unreliable results. (App. M-10 at 236-37.)

[28]The State also offered the expert testimony of Dr. Kirkland, however, he too was unable to
(continued...)

opined that Petitioner met most of the criteria for antisocial personality disorder, but admitted that organic brain damage could not be ruled out and can cause antisocial behavior.[29]

As to non-statutory mitigating evidence, the state courts simply chose not to give it any weight. The child abuse was rejected because Petitioner was 54-years old at the time of trial, and therefore, it was deemed to be too remote in time to be persuasive. *Porter*, 788 So. 2d at 924. His military service was deemed insignificant because he had gone AWOL several times. Finally, the alcoholism was dismissed because the evidence presented by Petitioner on that issue was inconclusive.[30]

  c.  *The Balancing Process*

---

[28](...continued)
offer a diagnosis of Petitioner:

> Q: Okay. Based on the information you had gathered, do you have any basis for determining whether or not George Porter currently or at the time he was examined by Dr. Dee – either time – suffered from any sort of brain abnormality?
>
> A: I would not be willing to make a diagnosis.
>
> Q: So you can't say that Dr. Dee is wrong if that is a conclusion that he's reached. Is that correct?
>
> A: That's correct.

(App. M-11 at 405.)

[29]In the field of psychology, a diagnosis of an organic brain syndrome precludes a diagnosis of anti-social personality disorder. Organic brain syndrome is a physiological condition, while anti-social personality disorder is a psychological diagnosis. (App. M-10 at 351-52.)

[30]The trial court found that Petitioner was sober at the time of the murders, *Porter*, 788 So. 2d at 924, but other evidence is to the contrary. In any event, for a fact to be mitigating it does not have to be relevant to the crime – any of "the diverse frailties of humankind," which might counsel in favor of a sentence less than death are mitigating. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

The state courts found no prejudice because the aggravating factors were so convincing that they far outweighed any mitigating evidence that could have been presented. *Porter*, 788 So. 2d at 925. This analysis is flawed for several reasons. First, two of the aggravating factors are admittedly technical and another is esoteric and weak. Finally, one of the strong aggravators relied on by the trial judge (HAC) was thrown out and must now be disregarded. Thus, the balance has unquestionably shifted away from aggravation.

Second, the state courts failed to properly consider the weight of the mitigating evidence, most importantly in regard to Petitioner's mental health. The Eleventh Circuit has held that "[w]hen there is conflicting testimony by expert witnesses . . . discounting the testimony of one expert constitutes a credibility determination, a finding of fact. A finding of fact made by a state court is presumed to be correct, and a habeas petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence." *Bottoson v. Moore*, 234 F.3d 526, 534 (11th Cir. 2000). In *Bottoson*, however, the court concluded that the petitioner had failed to rebut the presumptions of correctness with the following statement:

> Because the appropriate analysis laid out by Dr. Kirkland points ***strongly*** to a conclusion contrary to the opinion of Dr. Phillips, and because Dr. Kirkland ***expressly disagreed*** with Dr. Phillips's findings, we conclude that there is support in the instant record for the finding of fact of the state court discounting Dr. Phillips's opinions. Accordingly, we conclude that Bottoson has failed to rebut the presumption of correctness by clear and convincing evidence.

234 F.3d at 536 (emphasis added).

Here, Dr. Riebsame did not expressly disagree with Dr. Dee's findings and his analysis does not point strongly to a conclusion contrary to the opinion of Dr. Dee. The trial court's statement that

Dr. Riebsame "specifically disagreed with Dr. Dee" is simply wrong.  Instead, he declined to offer an

expert opinion on Petitioner.

> Q: All right, sir. The results of the Card Sorting Test, do those necessarily indicate that there is brain damage of some sort or abnormality?
>
> A: They – they're meant to give you some idea of possible brain abnormality or damage in the temporal lobe – frontal lobe area of the brain.
>
> Q: And do the scores here, would they support a finding of that existing?
>
> A: Yes. His scores would support that finding.
>
> Q: And the same as to the Booklet Categories Test?
>
> A: Yes.

(App. M-10 at 327.)

> Q: First, you are not making a diagnosis of – you're not suggesting that there should be a diagnosis of antisocial personality disorder as regards to Mr. Porter; are you?
>
> A: No, I'm not.
>
> Q: As a matter of fact, one of the reasons you stated that is you were unable to find the existence of what I believe is criteria, the C criteria, for antisocial personality disorder, the evidence of conduct disorder with onset before the age of fifteen years. Isn't that correct?
>
> A: Actually I would be reluctant to diagnosis (sic) someone I haven't examined. And I haven't examined Mr. Porter. So I wouldn't offer a diagnosis . . . .

(App. M-10 at 345.)

> Q: Okay. Of brain abnormality. That you don't discount the existence of brain abnormality. You wouldn't eliminate it given what you have seen.
>
> A: No, I would not eliminate it given what I have seen.

(App. M-10 at 382.)

This Court can find no factual support for the trial court's conclusion that Dr. Dee's testimony was directly challenged or not worthy of consideration. Indeed, it is questionable whether Dr. Riebsame even disagreed with Dr. Dee. Dr. Riebsame simply opined that Porter exhibited some of the criteria for antisocial personality disorder but, as previously noted, he did not render a diagnosis contrary to Dr. Dee's opinion of organic brain syndrome, and admitted that Porter's antisocial behavior is consistent with organic brain syndrome. Therefore, this Court finds that the state court's determination that Dr. Dee's testimony should be rejected is not entitled to a presumption of correctness under *Bottoson*.[31]

With respect to the non-statutory mitigating evidence, the state court made no credibility findings; rather it simply discounted its significance. Yet, there is no support in the record, for example, that the effects of child abuse diminish over time so as to become insignificant by age 54. Similarly, the fact that Petitioner went AWOL while in the military does not necessarily diminish his

---

[31]This Court agrees with Justice Anstead's assessment:

> [A]lthough we ordinarily give deference to the trial court's factual findings, after reviewing both of the experts' testimonies, we would be hard-pressed to approve the trial court's finding that the State's expert on mental mitigation was more credible, when the record reflects no factual basis for this conclusion, the State's expert neither personally met nor interviewed Porter before rendering his opinion, and the trial court cites no other basis for this factual conclusion. If anything, an objective evaluation would ordinarily render the examining expert's opinion more credible.

*Porter*, 788 So. 2d at 934 n.17 (Anstead, J., dissenting).

honorable and distinguished service.[32]   Indeed, the jury might well have been influenced by his

military record as summarized by Justice Anstead in his dissenting opinion:

> Lieutenant Colonel Sherman Pratt testified in great detail at the post-conviction
> evidentiary hearing that Porter provided heroic service during the Korean War and,
> more importantly for purposes of mitigation, he testified that Porter clearly suffered
> both physically and mentally, and that his company suffered the heaviest casualties in
> battle.   Porter joined the Army at age sixteen. Porter's service in the war earned him
> several combat medals, including: three Bronze Stars; the Combat Infantry Badge; and
> a Purple Heart (with first cluster). Moreover, he was favorably considered for the Good
> Conduct Medal, was entitled to award of the Korean Presidential Unit Citation, and
> was subsequently honorably discharged.

*Porter*, 788 So. 2d at 933 (Anstead, J., dissenting).  This evidence cannot simply be ignored because

in the view of the state court it may have been subject to impeachment.

With this background, the Court now must examine the totality of the evidence to determine

whether the adjudication of this claim in the state court resulted in a decision that involved an

unreasonable application of *Strickland*'s prejudice prong.   First, the state courts erred in failing to

consider the entire record on appeal.  That is, in determining prejudice, the courts did not consider the

evidence presented at trial as well as the evidence presented in the habeas proceedings as required by

federal law.  *See Williams*, 529 U.S. at 397-98 (holding that the Virginia Supreme Court's prejudice

determination was "unreasonable insofar as it failed to evaluate the totality of the available mitigation

evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding. . .").  The

state courts did not specifically consider, in the context of mitigation, evidence that this was a crime

of passion, that Petitioner was drinking heavily just hours before the murders, or that Petitioner had

---

[32]Petitioner's military record indicated he was AWOL three times; however, on two of those occasions, Petitioner may simply have been "lost."  (App. M-9 at 157.)  In any event, Petitioner received an honorable discharge regardless of these allegations.  (App. M-9 at 156.)

a good relationship with his son.  Failure to consider all of the mitigating evidence in the record is

contrary to established federal law.  *Id.*

Furthermore, the state court held Petitioner to an incorrect standard under federal law.  The

post-conviction court held that "[b]y the greater weight of the evidence, therefore, the Defendant has

failed to show that he was deprived of a reliable penalty phase proceeding and no prejudice has been

demonstrated."  (App. L-4 at 12.)  The Court went on to say "this Court is quite convinced that none

of the evidence it has reviewed would have altered the outcome of the sentencing proceedings."  (App.

L-4 at 13.)  However, this holding is contrary to that of *Strickland*:

> We believe that [petitioner] need not show that counsel's conduct more likely than not
> affected the outcome in the case . . . The result of a proceeding can be rendered
> unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot
> be shown by a preponderance of the evidence to have determined the outcome.

466 U.S. at 693-94; *see also  Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (discussing the *Strickland*

prejudice standard); *Nix v. Whiteside,* 475 U.S. 157, 175 (1986) ("[A] defendant need not establish

that the attorney's deficient performance more likely than not altered the outcome in order to establish

prejudice under *Strickland*"); *Hardwick*, 320 F.3d at 1162; *McLin v. State*, 827 So. 2d 948, 958 (Fla.

2002) (recognizing that the application of an outcome determinative test is contrary to *Strickland*).

Therefore, the state court's holding in *Porter* is contrary to clearly established federal law. *See*

*Williams,* 520 U.S. at 429-32.

At its core, this was a crime of passion; premeditated, but fueled by jealousy, affected by

alcohol, and committed by an individual who suffered an abusive childhood  and exhibited serious

mental health issues at the time of the offense.  Weighing the totality of the evidence, it appears that

the sentencing court relied upon one aggravator (HAC) which it should not have relied upon, two

"technical" aggravators, and an aggravator (heightened premeditation) which is in effect an element

of the offense itself.  The sentencing court did not have before it evidence of Petitioner's mental health

problems or the bulk of the non-statutory mitigation evidence which was available.  In light of the fact

that two Florida Supreme Court justices voiced strong opinions that a death sentence was not

warranted in this case, even without any mitigation, there is certainly a reasonable probability that the

presentation of mitigating factors would have influenced the decision of the sentencing court.

> In short, it is obviously difficult, if not impossible, to have confidence in a sentence
> that was imposed based upon a one-sided presentation, i.e., unchallenged aggravation
> and no mitigation, when it is later demonstrated that substantial mitigation exists and
> one of the most serious aggravators was improperly considered and stricken on appeal.
> To approve of counsel's default . . . is tantamount to holding that the defendant was
> not entitled to the benefit of counsel at his penalty phase proceeding.

*Porter*, 788 So. 2d at 932 (Anstead, J., dissenting).  Accordingly, the Court finds that the ineffective

assistance of counsel was prejudicial to Petitioner under the second prong of *Strickland*.

       d.     *Final Analysis of Claim Three*

The right to a fair trial is the foundation of our criminal justice system.  The right to the

effective assistance of counsel is a critical component of that right.  In a capital case, it is especially

important that the courts remain vigilant in protecting this constitutional entitlement.  In *Woodson v.

North Carolina*, 428 U.S. 280, 303 (1976), the Supreme Court noted that "death is a punishment

different from all other sanctions in kind rather than degree."  In the words of the Court, "[b]ecause

of that qualitative difference, there is a corresponding difference in the need for reliability in the

determination that death is the appropriate punishment in a specific case."  *Id.* at 305.  That degree of

reliability is simply lacking here.  Accordingly, the petition will be granted as to claim three.

**V.      Conclusion**

This Court finds that one of the claims raised in the instant petition has merit – Petitioner's claim that he was denied the effective assistance of counsel during the penalty phase of his trial (claim three).  All other claims alleged by Petitioner have been determined to be without merit and must be denied with prejudice.

Any of Petitioner's allegations not specifically addressed herein are determined to be without merit.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.      The Amended Petition for Writ of Habeas Corpus filed by George Porter, Jr. (Doc. No. 13) is **GRANTED in part and DENIED in part**.

2.      The Court determines that claims 1, 2, and 4 through 14 are without merit and that habeas relief is **DENIED with prejudice** with regard to those claims.

3.      The writ of habeas corpus will be conditionally **GRANTED** with regard to claim 3, for the reasons discussed above, within **NINETY (90) DAYS** from the date of this Order, unless the State of Florida initiates new sentencing proceedings in state court consistent with the law.

4.      The Clerk of the Court shall enter judgment accordingly and is directed to close this case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on this 18th day of June, 2007.

Copies furnished to:

Counsel of Record

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE